[Cite as *State v. Johnson*, 2023-Ohio-3920.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO

     Plaintiff-Appellee

-vs-

ALFRED L. JOHNSON

     Defendant-Appellant

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. John W. Wise, J.
Hon. Patricia A. Delaney, J.

Case No. 2022CA00163

O P I N I O N

CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of Common Pleas, Case No. 2022-CR-0342

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     October 27, 2023

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
Stark County Ohio

CHRISTOPHER A. PIEKARSKI
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South, Suite #510
Canton, Ohio 44702-1413

For Defendant-Appellant

DONOVAN R. HILL
122 Market Avenue, North
DeWalt Bldg., Suite #101
Canton, Ohio 44702

*Hoffman, P.J.*

**{¶1}** Defendant-appellant Alfred L. Johnson appeals the judgment entered by the Stark County Common Pleas Court convicting him following jury trial of murder (R.C. 2903.02(A)) with a firearm specification (R.C. 2941.145(A)) and sentencing him to an aggregate term of incarceration of eighteen years to life. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

**{¶2}** On February 13, 2022, Appellant hosted his family at his home to watch the Super Bowl. In attendance were Appellant, his nephew Nick Oosdyk, Oosdyk's sister Sara, Sara's husband David, and Sara's and David's sons, E.B. and D.B. E.B. was thirteen years old, while D.B. was eleven years old.

**{¶3}** Appellant and Oosdyk both had served in the military and both enjoyed shooting and guns. The men were close, spending time together on a monthly basis for around thirty years.

**{¶4}** Both Appellant and Oosdyk regularly babysat E.B. and D.B. However, Sara did not want the boys to have access to guns. Appellant told Sara he kept his guns locked in a safe when babysitting the boys. Although Oosdyk normally carried a concealed weapon in a holster, he agreed to store his gun in his vehicle when he was with the boys. Neither Appellant nor Oosdyk had been known by Sara or David to violate the agreement.

**{¶5}** Oosdyk was not generally a confrontational person. Although he and his sister Sara sometimes argued, he would walk away from the argument. He was not known by David, Sara, or Appellant to ever threaten anyone or engage in physical confrontations.

**{¶6}** On the day of the Super Bowl, Oosdyk arrived at Appellant's home around 3:30 in the afternoon. David and the boys arrived soon after. Sara arrived around 6:00. Prior to Sara's arrival, the boys played a Star Wars board game with Oosdyk and David. When the game started, David and Sara watched the game. The others were not interested in football, so the boys continued to play their game in another room, and Oosdyk went into the den with Appellant.

**{¶7}** E.B. went to the den to see if Oosdyk wanted to play the Star Wars game with them again. Oosdyk declined. Oosdyk and Appellant appeared to be engaged in a normal conversation at the time. E.B. returned to the den later to discuss the game with Oosdyk. E.B. noticed the conversation between Appellant and Oosdyk was slightly "raised," although they were not yelling. Tr. 315. E.B. chose to leave the den without saying anything. Shortly thereafter, E.B. heard Appellant and the victim discussing the Ukraine crisis through the wall.

**{¶8}** At the end of the first quarter of the football game, David and Sara heard two shots. They could not place the sounds immediately. Sara thought the sounds were fireworks, while David believed there was a catastrophic furnace failure. When David and Sara got up to investigate and look for the boys, they heard a third shot. Shortly thereafter, they heard more shots in quick succession. The boys ran to David and Sara.

**{¶9}** Appellant met David and Sara in the hallway and repeatedly yelled at them to get out of the house. His behavior was demanding and aggressive. Sara asked Appellant if Oosdyk shot himself. Appellant replied he had not. Sara then asked Appellant if he shot Oosdyk. Appellant replied affirmatively. When Sara asked if Oosdyk was still alive, Appellant told her to get out of the house.

{¶10} Sara and David took the boys and left, calling 911 when they got home Appellant also called 911 and waited in his driveway for the police to arrive. Officer David Picard of the Uniontown Police Department was the first to arrive. When he encountered Appellant, Appellant had his hands in the air. The officer asked Appellant what happened. Appellant explained they were arguing and Oosdyk said the wrong things. Appellant stated he lost his temper. When the officer asked Appellant to stay still for a moment, Appellant told the officer to cuff him and be done with it. Appellant stated he had already screwed his whole life up.

{¶11} After backup arrived, and with Appellant handcuffed in the cruiser, police cleared the scene so medics could safely enter. Oosdyk was found dead in the house as the result of five gunshot wounds. His blood alcohol level was .087, slightly above the legal limit to drive.

{¶12} Appellant was taken to the police station where he was booked. Appellant told Officer Picard he was stupid, and made a big mistake.

{¶13} Lt. Nathan Weidman of the Uniontown Police Department spoke with the coroner and was informed Oosdyk was wearing a soft holster on his hip. Lt. Weidman went to Appellant's home, where Oosdyk's car was still parked. He was met at the house by Appellant's son. While the son was cooperative, he told the officer his mom wanted one thing out of Oosdyk's car before it was towed. After a conversation, both Appellant's son and the police officer realized they both wanted Oosdyk's gun from the vehicle, Lt. Weidman had the vehicle towed, where police found Oosdyk's loaded pistol in the glove compartment.

**{¶14}** Appellant was indicted by the Stark County Grand Jury with one count of murder with a firearm specification. The case proceeded to jury trial in the Stark County Common Pleas Court.

**{¶15}** Appellant testified at trial. Appellant testified during the Super Bowl, he was sitting in his chair in the den talking to Appellant, who was seated on the couch. According to Appellant, while the men often disagreed with each other, they could always say what they wanted without the other getting offended. Appellant testified Oosdyk was getting drunk, and the conversation turned from light-hearted to serious. Appellant claimed he teased Oosdyk that due to Oosdyk's age, the military could recall him if a war with Russia took place. Oosdyk became agitated. Appellant claimed he tried to calm Oosdyk down, to no avail. Appellant claimed he became afraid because Oosdyk was 41 years old and in pretty good shape, while Appellant was 75 years old.

**{¶16}** Appellant testified he suggested Oosdyk go sleep in a bedroom because he was drunk. Oosdyk insisted he was not drunk and could drive home. Appellant testified he told Oosdyk he was going to get Sara to try to talk to him. Appellant testified Oosdyk then said, "Okay, go get the bitch, I'll kill her and the God damn boys, too." Tr. 523. Appellant testified Oosdyk was angry with the boys because the boys had argued about the Star Wars game.

**{¶17}** Appellant testified Oosdyk got off the couch and got in Appellant's face to berate him about being retired after wasting his life working. Oosdyk sat back down on the couch and crossed his arms. Appellant grabbed his pistol because he could not let Oosdyk hurt the boys, and feared Oosdyk was going to carry through on his threat. Appellant concealed the gun behind his back. Appellant testified Oosdyk leaned forward

and reached back while sitting on the couch.  Appellant took this as a sign Oosdyk was going to get up and carry out his threat to kill the boys.  Appellant shot Oosdyk in the face.  Appellant expected the victim to drop over, but the victim continued moving.  Appellant shot Oosdyk in the chest.  Oosdyk managed to move a few feet before collapsing on the floor.  Appellant testified he still believed Oosdyk was a threat because he was moving as if trying to get up.  Appellant then shot Oosdyk twice more in the back and once in the back of his head.  Appellant testified he believed he was protecting the boys, and had no other viable option but shooting Oosdyk.   Appellant testified he assumed Oosdyk was carrying his gun that night because Oosdyk always had a gun.  Appellant admitted he had at times carried a gun around the boys, and assumed Oosdyk also carried a gun around the boys.  Although Appellant was a retired firefighter medic, he made no effort to aid Oosdyk, instead waiting for the emergency squad to arrive.  Appellant claimed he was not honest with the police when he stated he lost his temper, and testified he never actually lost his temper with Oosdyk.

{¶18} The trial court instructed the jury on the defense of defense of others.  The jury found Appellant guilty of murder and the accompanying firearm specification.  The trial court convicted Appellant in accordance with the jury's verdict.  The trial court sentenced Appellant to a term of incarceration of fifteen years to life for murder and three years incarceration for the firearm specification, to be served consecutively for an aggregate term of eighteen years to life in prison.  It is from the November 30, 2022 judgment of the trial court Appellant prosecutes his appeal, assigning as error:

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AS THE STATE DID NOT MEET ITS BURDEN OF DISPROVING BEYOND A REASONABLE DOUBT THAT APPELLANT ACTED IN DEFENSE OF OTHERS.

**{¶19}** Appellant argues the jury's verdict was against the manifest weight of the evidence, as the State failed to disprove his defense he was defending his niece's family when he shot Oosdyk.

**{¶20}** Appellant was convicted of murder in violation of R.C. 2903.02(A), which provides in pertinent part, "No person shall purposely cause the death of another." At the close of Appellant's jury trial, the trial court provided the jury with an instruction regarding defense of others, which means the trial court concluded the record contained evidence which tends to support Appellant used the force in defense of others when he shot and killed Oosdyk. R.C. 2901.05(B)(1); *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 26. The guilty verdict means the State met its burden of persuading the jury beyond a reasonable doubt Appellant was not acting in self-defense when he killed Oosdyk. *Id.*

**{¶21}** The elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief he (or as applicable in the case sub judice, another) was in imminent danger of death or great bodily harm and his only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to

retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

**{¶22}** Pursuant to R.C. 2901.05, if there is evidence presented at trial which tends to support a claim the defendant used force against another in self-defense or in defense of another, the State must prove beyond a reasonable doubt the defendant did not use the force in self-defense or defense of another. R.C. 2901.05(B)(1). Once the initial showing is made, the burden of persuasion requires the State to disprove at least one of the elements of self-defense or defense of another beyond a reasonable doubt. *State v. Williams,* 5th Dist. Stark No. 2019CA00188, 2021-Ohio-443, ¶17.

**{¶23}** The second element of self-defense requires the evidence tends to show the accused had reasonable grounds to believe or an honest belief, even if mistaken, he or another was in imminent or immediate danger of death or great bodily harm. In *State v. Thomas,* the Ohio Supreme Court explained:

[T]he second element of self-defense is a combined subjective and objective test. As this court established in *State v. Sheets* (1926), 115 Ohio St. 308, 310, 152 N.E. 664, self-defense "is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." (Emphasis sic.) See, also, *McGaw v. State* (1931), 123 Ohio St. 196, 174 N.E. 741, paragraph two of the syllabus. In *Koss*, we once again stated this test by approving similar jury instructions to those given in the case sub judice:

"In determining whether the Defendant had reasonable grounds for an honest belief that she was in imminent danger, you must put yourself in the position of the Defendant * * *. You must consider the conduct of [the assailant] and determine if such acts and words caused the Defendant to *reasonably* and *honestly* believe that she was about to be killed or to receive great bodily harm.' " (Emphasis added.) *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d at 973. Thus, the jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she *reasonably* believed she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *State v. Shane* (1992), 63 Ohio St.3d 630, 634, 590 N.E.2d 272, 276 ... Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *Shane, supra,* 63 Ohio St.3d at 634, 590 N.E.2d at 276.... 77 Ohio St.3d 323, 330-331, 673 N.E.2d 1339 (1997).

**{¶24}** "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane,* 63 Ohio St.3d 630, 634-45, 590 N.E.2d 272 (1992).

{¶25} Appellant argues the jury's verdict rejecting his claim of defense of others and convicting him of murder is against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin,* 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983). We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶26} We find the jury did not lose its way in rejecting Appellant's claim he shot and killed Oosdyk defending his family. Even accepting Appellant's testimony as true, the jury could conclude he did not have an honest and bona fide belief his niece's family was imminent danger. Appellant testified when he first shot Oosdyk, Oosdyk was seated on the couch. Although according to Appellant's testimony Oosdyk threatened to kill Sara and the boys, words alone are not reasonably sufficient provocation to incite the use of deadly force in most situations. Appellant claimed the victim reached backwards toward his left side where he usually carried a gun. However, Oosdyk was not carrying a weapon at the time, and Appellant was aware of Sara's rule weapons not be present around the

boys.  Although Appellant claimed he believed Oosdyk would carry out his threat and he, being older and in worse physical condition than Oosdyk, would be unable to stop him absent the use of deadly force, there was evidence presented at trial Oosdyk was not known to be violent or confrontational, and would instead walk away from a confrontation. We find even if the jury believed Appellant's testimony, the jury did not lose its way in finding he did not have an honest and bona fide belief his family was in imminent danger from Oosdyk, who was still seated on the couch in a different room from Sara and her sons when Appellant shot him in the face.

{¶27} We also find the jury did not lose its way if the jury discredited Appellant's trial testimony he shot Oosdyk in defense of his family.  Appellant spoke to the police immediately after the shooting and at his booking, and never mentioned shooting Oosdyk in defense of others.  Appellant did not tell police Oosdyk had threatened Sara and her sons.  Appellant told Officer Picard he and Oosdyk were arguing, Oosdyk said the wrong things, and Appellant lost his temper.   Further, after the supposed danger was over because Sara, David, and the boys had left the house, Appellant made no effort to aid Oosdyk, despite having previously been employed as a firefighter and medic.  We find the jury could reasonably find Appellant's statements to police on the night of the shooting more credible than his trial testimony.

**{¶28}** The assignment of error is overruled.  The judgment of the Stark County Common Pleas Court is affirmed.


By: Hoffman, P.J.

Wise, J.  and

Delaney, J. concur